IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FOSTER MADE, LLC,

       **Plaintiff,**

v.                                                                                                              Civil Action No. 3:17cv775

**ED FOSTER, IV,**

       **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Ed Foster, IV's ("Defendant") "Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue Pursuant to Fed. R. Civ. P. 12(b)(2) & (3) or, in the Alternative to Transfer the Action to the United States District Court of the Middle District of Florida, Tampa Division Pursuant to 28 U.S.C §1406(a)" (the "Motion to Dismiss").[1] (ECF No. 7.) Plaintiff Foster Made, LLC ("Foster Made" or "Plaintiff") responded. (ECF No. 12.) Defendant did not file a reply and the time to do so has expired. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Accordingly, the matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[2] For the reasons that follow, the Court will grant the Motion to Dismiss.[3]

---

[1] Defendant filed an identical document as a "Motion to Transfer Case," (the "Motion to Transfer"). (ECF No. 9.) The Court will refer to the motions separately for the sake of clarity.

[2] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332. Plaintiff is a citizen of Virginia and Defendant is a citizen of Florida. The Complaint alleges damages exceeding $75,000.

[3] Consequently, the Court will deny as moot Defendant's Motion to Transfer.

# I. Procedural Background

Foster Made initiated this action against Defendant by filing a Complaint in the Circuit Court for the City of Richmond, alleging two claims under Virginia law.[4] Defendant removed the case to this Court. (ECF No. 1.) Defendant then filed the Motion to Dismiss and the Motion to Transfer (collectively, the "Motions"). Plaintiff opposed the Motions.

# II. Applicable Legal Standards: Personal Jurisdiction

## A. Burden of Proof: Motion to Dismiss Under Rule 12(b)(2)

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). When a district court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence. *Id.*; *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Machulsky v. Hall*, 210 F. Supp. 2d 531, 537 (D.N.J. 2002) ("[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction." (quoting *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 603–04 (3d Cir. 1990)).). "If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds*

---

[4] Plaintiff's Complaint asserts claims for (1) "Violation of the Trademarks and Services Marks Statute (Va. Code Ann. § 59.1-92.12)"; and, (2) "Unfair Competition." (Compl. 4–6, ECF No. 1-1.)

*Foil, Inc. v. Pai*, No. 3:09cv657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)).

The Court "has considerable procedural leeway in choosing a methodology for deciding the [Rule 12(b)(2)] motion." 5B Alan Wright and Arthur Miller, Federal Practice and Procedure § 1351, at 305 (3d ed. 2004). A number of courts have identified three possible approaches: ruling on the written record, permitting discovery, or holding an evidentiary hearing. *See, e.g., Williams v. FirstPlus Home Loan Tr. 1996-2*, 209 F.R.D. 404, 409 (W.D. Tenn. 2002) (stating that a court "may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions."). A hearing may be appropriate "in particularly complex cases." 5B Alan Wright and Arthur Miller, Federal Practice and Procedure § 1351, at 305, 308 (3d ed. 2004). In straightforward cases, like the one before the Court, "[t]he Court may resolve the issue based on the affidavits and the supporting documents" without a hearing. *Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 477–78 (E.D. Va. 1997).

When ruling on a Rule 12(b)(2) Motion to Dismiss, the Court may rely on "motion papers, supporting legal memoranda, and the allegations in the complaint." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009) (citing *Combs*, 886 F.2d at 676); *see also* 5B Alan Wright and Arthur Miller, Federal Practice and Procedure § 1351, at 305 (3d ed. 2004) ("The court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts."). "For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true." *Reynolds Foil*, 2010 WL 1225620, at *1. "The [c]ourt, in deciding whether a plaintiff has met th[e] burden [of making a prima facie case

supporting personal jurisdiction], must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Brooks v. Motsenbocker Advanced Devs., Inc.*, 242 F. App'x 889, 890 (4th Cir. 2007). Still, a plaintiff cannot rely on "bare pleadings alone" after a defendant properly challenges personal jurisdiction. *Machulsky*, 210 F. Supp. 2d at 537 (quotation omitted). Instead, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits and competent evidence .... [A] plaintiff must respond with actual proof[], not mere allegations." *Id.* (quotation omitted); *see also FirstPlus*, 209 F.R.D. at 409–10 (concluding that a court need not "ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiffs." (quoting *Kerry Steel v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir.1997))).

### B. <u>Personal Jurisdiction Standard: Generally</u>

Federal courts exercise personal jurisdiction in the manner provided by state law. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). Therefore, a district court must first decide whether Virginia state law permits the court to exercise personal jurisdiction over the defendant, and second, whether the exercise of such jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Id.*; *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).

"Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d

132, 135–36 (4th Cir. 1996)) (internal citation omitted). Accordingly, the inquiry becomes whether the defendants maintain sufficient minimum contacts with the forum state so as not to offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst*, 334 F.3d at 397. "If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction. . . . [I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State."[5] *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & nn.8–9 (1984)).

The United States Court of Appeals for the Fourth Circuit has adopted a three-part test to determine whether specific jurisdiction exists. *Reynolds Foil*, 2010 WL 1225620, at *2. The Court must consider: "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State;[6] (2) whether the plaintiffs' claims arise out of

---

[5] General jurisdiction exists only when a defendant's "affiliations with the [s]tate are so 'continuous and systematic' as to render [it] *essentially at home* in the forum [s]tate.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (emphasis added). Nothing in the record indicates, and Plaintiff does not contend, that Defendant engaged in "continuous and systematic" activities within Virginia. *ALS Scan*, 293 F.3d at 712. Consequently, the Court's inquiry focuses on whether Defendant's conduct allows the Court to exercise specific personal jurisdiction over Defendant.

[6] With respect to the first factor, "no clear formula [exists] for determining what constitutes 'purposeful availment.'" *Reynolds Foil*, 2010 WL 1225620, at *2. No dispute as to

5

those activities directed at the State;[7] and[,] (3) whether the exercise of personal jurisdiction would be constitutionally reasonable."[8] *ALS Scan*, 293 F.3d at 712 (alteration in original) (internal citations omitted). "If, and only if . . . the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three." *Consulting Eng'rs*, 561 F.3d at 278.

---

whether Defendant could meet the traditional purposeful availment prong outside of the context of the Internet exists, as parties have not alleged that Defendant had any contact with Virginia other than through his website.

Further, the Supreme Court long has held that the purposeful availment prong of the personal jurisdiction analysis can be met if a defendant's "intentional conduct [in the foreign state was] calculated to cause injury to [the plaintiff] in [the forum state]." *Calder v. Jones*, 465 U.S. 783, 791 (1984) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."). *Calder*, however, does not vest jurisdiction in a state merely because it serves as the locus of the plaintiff's injury. *See Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014) ("[M]ere injury to a forum resident is not a sufficient connection to the forum.").

The "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum *in a meaningful way*." *Id.* (emphasis added); *see also ESAB*, 126 F.3d at 626 ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").

[7] "The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs*, 561 F.3d at 278–79 (citing *Burger King*, 471 U.S. at 472; *Helicopteros*, 466 U.S. at 414). Although Plaintiffs allege they suffered harm in Virginia, the Court need not address this prong because Defendant does not meet the "purposeful availment" prong of the analysis. *See ALS Scan*, 293 F.3d at 712.

[8] The third prong of the specific jurisdiction test "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Consulting Eng'rs.*, 561 F.3d at 279. Specifically, the court may consider: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and, (5) the interests of the states in furthering substantive social policies. *Id.* (citing *Burger King*, 471 U.S. at 477). The Court need not address this prong for the reasons stated above.

### C. Personal Jurisdiction: Internet-Based Contacts

"Applying the traditional due process principals governing a [s]tate's jurisdiction over persons outside of the [s]tate based on Internet activity requires some adaptation of those principles. . . ." *ALS Scan*, 293 F.3d at 712; *see also Bright Imperial Ltd. v. RT MediaSolutions, S.R.O*, No. 1:11cv935, 2012 WL 1831536 (E.D. Va. May 18, 2012). "Technology cannot eviscerate the constitutional limits on a [s]tate's power to exercise jurisdiction over a defendant." *ALS Scan*, 293 F.3d at 711. Merely placing information on the Internet does not suffice to justify a state's exertion of personal jurisdiction over a person or entity. *Id.* at 714. If the Court "were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each [s]tate in which the information is accessed, then the defense of personal jurisdiction, in the sense that a [s]tate has geographically limited judicial power, would no longer exist." *Id.* at 712.

The Fourth Circuit, consistent with the concerns espoused in *Calder*, has developed a three-part test to analyze personal jurisdiction in the context of Internet-based contacts. *See ALS Scan*, 293 F.3d at 714. A state "may, consistent with due process, exercise judicial power over a person outside of the [s]tate when that person (1) directs electronic activity into the [s]tate, (2) with the manifested intent of engaging in business or other interactions within the [s]tate, and (3) that activity creates, in a person within the [s]tate, a potential cause of action cognizable in the [s]tate's courts." *Id.*; *see also Bright Imperial*, 2012 WL 183153, at *4. A person who simply places information on the internet, with nothing more, cannot be subjected to personal jurisdiction in each state into which the electronic signal is transmitted and accessed. *See ALS Scan*, 293 F.3d at 714; *see also Carefirst*, 334 F.3d at 399.

7

Relevant here, this Court employs the "sliding scale" model developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa. 1997), as modified and adopted by the Fourth Circuit in *ALS Scan*, to assess whether a defendant's alleged conduct has met the "manifested intent" element of the test above when the conduct flows exclusively from a defendant's contact with the forum state via an internet-based website. *ALS Scan*, 293 F.3d at 713. The *Zippo* court utilized a three-level sliding scale[9] to determine whether a website's electronic contacts with a state suffice to exercise personal jurisdiction by distinguishing among interactive, semi-interactive, and passive websites. *Id.*

Under this scale, websites that knowingly and repeatedly interact with entities or persons within a particular jurisdiction likely establish specific personal jurisdiction for the website owners. *Id.* On the other end, passive websites which "merely make[] information available . . . cannot render [the website owner] subject to specific personal jurisdiction." *Carefirst*, 334 F.3d at 399 (citing *Zippo*, 952 F.Supp. at 1124).

As articulated below, this case involves the application of the middle of the *Zippo* scale: a semi-interactive website. A semi-interactive website, which permits some exchange of

---

[9] The "sliding scale" recognizes three categories of websites:

> When a defendant runs an interactive site, through which he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet," he can properly be haled into the courts of that foreign jurisdiction. If, by contrast, the defendant's site is passive, in that it merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court. Occupying a middle ground are semi-interactive websites, through which there have not occurred a high volume of transactions between the defendant and residents of the foreign jurisdiction, yet which do enable users to exchange information with the host computer. "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs."

*Carefirst*, 334 F.3d at 399 (internal citations omitted) (quoting *Zippo*, 952 F.Supp. at 1124).

8

communication between the website and forum, may subject its owner to specific personal jurisdiction depending on the level and quality of interactivity. *Id.* "The personal jurisdiction analysis in the e-commerce setting is necessarily fact intensive, and each cause of action is unique. The facts in [a given] case, only slightly altered, could result in a different outcome." *Bright Imperial*, 2012 WL 1831536, at *1.

### III. Factual Background[10]

Defendant, a Florida resident, began working as a web developer in 2006 as a sole proprietor.[11] (Mem. Supp. Mot. Dismiss 2, 3, ECF No. 8; *see also* Foster Decl. ¶ 4, ECF No. 9-1.) On November 24, 2009, approximately nine years ago, Defendant registered the domain name fostermade.com and began conducting his web development business under the name Fostermade.[12] On February 3, 2014, more than four years ago, Defendant "formed his own Florida limited liability company under the name Fostermade, LLC." (Mem. Supp. Mot. Dismiss 3; *see also* Foster Decl. ¶ 6.) Since then, Defendant has

---

[10] On a Motion to Dismiss pursuant to Rule 12(b)(2), the Court will "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Brooks*, 242 F. App'x at 890. The Court "may presume that any uncontradicted evidence submitted by either party is true." *Reynolds Foil*, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010).

[11] Although the Court construes the allegations favorably toward Plaintiff, the Court need not ignore Defendant's uncontradicted factual claims, either. *See Reynolds Foil*, 2010 WL 1225620, at *1 ("For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true."); *see also FirstPlus*, 209 F.R.D. at 409–10. Defendant's Motion to Dismiss, and his accompanying Declaration, provide additional factual context which Plaintiff does not dispute. The Court therefore considers this information in analyzing the Motion to Dismiss.

[12] Although he registered the domain name in 2009, Defendant actually launched his website in Spring 2017, after Plaintiff had adopted the name "Foster Made" in 2016. Before August 15, 2017, when a user typed "fostermade.com" into a web browser, the website did not have any meaningful content. As of August 15, 2017, the website contained information related to Defendant's web development business, including contact information.

9

conducted his web development business as Fostermade, LLC, which is not registered to do business in any state other than Florida. He has never worked for a Virginia-based client and has "never initiated any communications directed to Plaintiff in the Commonwealth of Virginia."[13] (Mem. Supp. Mot. Dismiss 4; *see also* Foster Decl. ¶ 9.)

Plaintiff describes itself as a website design and consulting company based in Richmond, Virginia. Plaintiff adopted "Foster Made" as its new name sometime in 2015,[14] six years after Defendant registered his internet domain name and began doing business in Florida under the same name, and approximately one year after Defendant formed his limited liability corporation in Florida.[15] Plaintiff became the owner of the "Virginia state trademark registration for 'Fostermade' in International Class 42" (the "Trademark") at an unspecified time after its 2015 decision to operate as "Foster Made."[16] (Compl. ¶ 5.) Plaintiff launched its

---

[13] Foster declares, under oath, other undisputed facts related to his contacts, or lack of contacts, with Virginia. As a life-long resident of Florida, he has never resided in Virginia, does not own real property in Virginia, and does not hold any licenses granted by Virginia. His company, Fostermade, LLC, has a single business address in Florida.

[14] According to Defendant, Plaintiff previously conducted business as "Visual Chefs" and "eecoder." (*See* Ex. A, ECF No 8-1.) This assertion does not affect the Court's decision.

[15] In its Response brief, Plaintiff erroneously states that "there is an issue of fact for trial as to when the defendant's use of the infringing [Trademark] began." (Resp. Mot. Dismiss 4, ECF No. 12.) No dispute exists before the Court. Defendant stated, under penalty of perjury, that he registered the fostermade.com domain name in 2009 and began doing business under the name Fostermade at that time. Plaintiffs do not allege any facts to the contrary, nor do they expressly discredit Defendant's position. The Court sees no issue of fact. *See Reynolds Foil*, 2010 WL 1225620, at *1 (stating that a court "may presume that any uncontradicted evidence submitted by either party is true.") Although the Court construes the allegations in the light most favorable to Plaintiff, the Court will not infer allegations that Plaintiff itself declines to make. *See Brooks*, 242 F. App'x at 890.

[16] For clarity, Defendant operates his business as "Fostermade" as one word. Plaintiff operates its business as "Foster Made" with a space between "Foster" and "Made." The minor difference has no bearing on the Court's analysis.

website, "fostermade.co"[17] in the summer of 2016, (Maida Decl. ¶ 3, ECF No. 12-1), and used its Trademark in commerce for the first time in September 2016.

On August 3, 2015, after Plaintiff decided to adopt the name "Foster Made" but before it conducted any business using this name, Plaintiff made an anonymous offer[18] to purchase Defendant's internet domain name "fostermade.com" for $575. No dispute exists that Defendant did not know that Plaintiff made the anonymous offer, or that Defendant had not actively sought to sell the domain name. He made a counteroffer to sell the domain name for $240,000.[19] The buyer (Plaintiff) anonymously declined the counteroffer and negotiations ceased.

Plaintiff asserts that after it declined to purchase Defendant's web domain, Defendant launched a website at fostermade.com purporting to showcase a web development business and

---

[17] Defendant Foster owns the domain name "fostermade.com." Plaintiff Foster Made owns the domain name "fostermade.co" without an "m" at the end.

[18] A third-party entity, "GoDaddy domain buy service," ("GoDaddy") facilitated the exchange of anonymous communication between the parties. (Foster Decl. ¶¶ 13–14.)

[19] In the Complaint, Plaintiff alleges that Defendant, "with knowledge of [Plaintiff] Foster Made's intent to use that name for its business, demanded $240,000[] for the fostermade.com domain name." (Compl. ¶ 6.) Although the Court construes the allegations favorably toward Plaintiff, the standalone allegation that Defendant acted "with knowledge" of Plaintiff's intent to use the name for its business amounts to a conclusory statement that does not provide facts from which the Court could make a reasonable inference in favor of Plaintiffs about Defendant's knowledge. At most, the Court might infer that Defendant knew a different and unspecified entity desired to purchase and use the domain name fostermade.com. Plaintiff alleges no facts to suggest or from which the Court could infer Defendant knew of its business plans, or even identity, at the time the $240,000 offer of sale occurred.
The Defendant's declaration comports with the Court's conclusion. Defendant speculated that the potential buyer might be a "highly motivated buyer such as Foster Beer that might be willing to purchase the domain name for a significant amount." (Mem. Supp. Mot. Dismiss 3; *see also* Foster Decl. ¶ 17.) Defendant swears he had no knowledge of the identity of the anonymous prospective buyer until he was served with process in this lawsuit.

11

offering contact information.[20] Plaintiff contends, and Defendant concedes, that Defendant knew about Plaintiff's business when he launched his website in 2017.[21] Plaintiff claims that Defendant knowingly violated Plaintiff's Trademark through the use of the website and engaged in unfair competition.[22] Plaintiff alleges that Defendant added content to his website "specifically to imitate the services offered by Foster Made," with the purpose of causing harm

---

[20] Defendant's website contains various screens where users can view basic information about his business. ("Fostermade.com Screenshots," 21–22, 28–29, ECF No. 9-1.) It also has a tab entitled "Get in Touch" that contains an online form allowing visitors to send Defendant contact information and details about potential projects. However, the website does not permit prospective clients to do more than provide information or ask questions about Defendant's business. For instance, on its face, no visitor could contract with Defendant using this website.

The Complaint states, "upon information and belief . . . Defendant has received communications and business opportunities that would have been, if not for . . . Defendant's wrongful actions, directed at [Plaintiff]." (Compl. ¶ 11.) But Plaintiff does not dispute evidence submitted by Defendant to the contrary. Defendant has received only five contacts through the online form at fostermade.com. He avers that three of the contacts were tests that he sent to himself, the fourth was received from a friend in Ohio, and the fifth was a spam message. Defendant declares he has never engaged in business with a Virginia-based entity or received any contact from Virginia through his website. Plaintiff does not dispute Defendant's characterization of his web-based contact and alleges no facts in support of its claim that Defendant took business away from Plaintiff.

[21] Defendant states that in August 2016, he accidentally typed "fostermade.co" instead of "fostermade.com" into his web browser, inadvertently discovering Plaintiff's website. Defendant launched his website after this incident, in August 2017.

[22] Plaintiff claims Defendant uploaded "misleading content to his website for the purpose of holding Plaintiff's [Trade]mark and associated goodwill for ransom, [in an effort] to influence Foster Made into purchasing the [w]ebsite for an exorbitant price." (Compl. ¶ 10.)

Plaintiff's characterization of the information on Defendant's website as "misleading" constitutes a conclusory allegation not entitled to the assumption of truth. (Compl. ¶ 10.) Plaintiff alleges that Defendant's webpage uses the name, describes web development services, and provides contact information for Defendant. But no dispute exists that Defendant runs a web development business named Fostermade, and Plaintiff does not contest that Defendant began conducting business as Fostermade in 2009. Further, Plaintiff fails to allege any factual allegations in support of its conclusion that Defendant acted with the intent to coerce Plaintiff into purchasing the "fostermade.com" domain name. Although the Court construes the allegations in the light most favorable to Plaintiff, the Court need not defer to Plaintiff's conclusory allegations.

to Plaintiff in Virginia by violating Plaintiff's Trademark and creating consumer confusion and deception. (Compl. ¶¶ 4–6, 9, 13.)

## IV. Analysis: Plaintiff Cannot Establish Specific Personal Jurisdiction

Plaintiff brings this action against Defendant claiming that the content that Defendant placed on his website caused Plaintiff tortious injury in Virginia. Specifically, Plaintiff alleges that Defendant violated its Trademark and engaged in unfair competition. Defendant challenges the Court's ability to exert personal jurisdiction over him, asserting that he does not maintain sufficient minimum contacts with the forum state so as not to offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken* 311 U.S. at 463); see also *ALS Scan*, 293 F.3d at 714. Plaintiff counters that Defendant purposefully directed his activities into Virginia when he launched his fostermade.com website with actual knowledge of Plaintiff's Virginia-based business.[23] Because Plaintiff fails to establish a prima facie case in support of exerting specific personal jurisdiction over Defendant, the Court will dismiss the Complaint.

For Defendant's website to bring Defendant within the jurisdiction of Virginia courts, Defendant must have done more than merely place information on the Internet. *Carefirst of Md., Inc.*, 334 F.3d at 399 (citing *ALS Scan*, 293 F.3d at 712). Rather, Defendant must have acted with the "manifested intent" of targeting Virginians. *Id.*

---

[23] Plaintiff, rightfully, does not assert that the failed negotiations over the purchase of Defendant's internet domain name "fostermade.com" create any contact between Defendant and Virginia for the purpose of specific personal jurisdiction. Nothing in the record suggests Defendant knew he engaged with a Virginia entity when the parties negotiated anonymously, Plaintiff does not argue that the negotiation took place in Virginia, and neither party claims GoDaddy resides in Virginia for the purpose of personal jurisdiction.

Whether Defendant sought to expressly target Virginians "can be determined only from the character of the website at issue." *Id.* at 400.

The Defendant's website constitutes a semi-interactive website for the purpose of this Motion to Dismiss, albeit barely so.[24] *See ALS Scan*, 293 F.3d at 713–14 (citing *Zippo*, 952 F.Supp. at 1124). Website visitors, including those in Virginia, can read about Defendant's services and may submit information through an online form for the Defendant to contact them about potential business. Drawing the evidence most favorably towards establishing jurisdiction, as it must, the Court concludes that this online form suffices to establish Defendant's website as "semi-interactive" for purposes of the Motion to Dismiss. *See Brooks*, 242 F. App'x at 890.

When analyzing a semi-interactive website, a court must determine whether to exercise jurisdiction by "examining the level of interactivity and commercial nature of the exchange of information that occurs" to determine whether Defendant acted with the "manifested intent" required to establish jurisdiction. *Carefirst*, 334 F.3d at 399 (quoting *Zippo*, 952 F.Supp. at 1124); *see also Bright Imperial*, 2012 WL 183153, at *5. Defendant declares, without contradiction, to have received five submissions through the online form at fostermade.com. He received three submissions from himself as part of testing, one submission from a friend in Ohio, and one spam message from an unspecified source. None of the submissions resulted in

---

[24] In addition to containing what amounts to passive information under *ALS Scan* that describes the nature of Defendant's consulting work under internal webpages entitled "What We Do" and "Our Work," fostermade.com also contains features that make it possible for a user to exchange information with the host computer. (Fostermade Screenshots 21–22, 28–29.) Under an internal webpage on fostermade.com entitled "Get in Touch," an online form displays the message "Ready to get started? Give us as much info as you can and we will get back to you soon," and prompts prospective customers for a name, email address, company name, website address, budget, and timeline. (*Id.* 29.)

commerce. Plaintiffs do not allege any "exchange of information" between Defendant and any Virginia resident. *Carefirst*, 334 F.3d at 399. The mere existence of the online form cannot not suffice to establish jurisdiction.[25] *See id.* at 401.

Plaintiff alleges Defendant launched his website "with the intention of causing harm in Virginia" because Defendant knew about Plaintiff's Virginia-based web developing business by the same name and therefore knew he was infringing on the Trademark. (Compl. ¶ 9.) Plaintiff's conclusory allegation cannot suffice to subject Defendant to personal jurisdiction in Virginia. The Complaint, and record as a whole, does not proffer any facts suggesting that Defendant's website in any way targeted Virginia or Virginians. *See Carefirst*, 334 F.3d at 400 (finding that whether Defendant sought to target residents of a certain state "can be determined only from the character of the website at issue.") That Defendant acted with knowledge of Plaintiff's existence does not suffice, especially given that his use of the name Fostermade predates Plaintiff's use of the name Foster Made by six years. *See id.*

Plaintiff also argues jurisdiction is proper because Defendant's actions caused harm in Virginia when Defendant's website "caused actual confusion among [Plaintiffs'] clients and

---

[25] In *Carefirst*, the Fourth Circuit considered whether Maryland could exert personal jurisdiction over an Illinois-based organization that provided services to Chicago residents. 334 F.3d at 400–01. The Illinois-based organization's website allowed visitors to donate to the organization online. *Id.* "[T]he only respect in which [the defendant] even arguably reaches out to Marylanders via its Internet website is in its generalized request that anyone, anywhere make a donation to support" the defendant's organization. *Id.* at 401. The *Carefirst* court concluded, "[s]uch a generalized request is, under the circumstances, an insufficient Maryland contact to sustain jurisdiction in that forum." *Id.*

Like the website in *Carefirst*, Defendant's website allows anyone, anywhere to submit information on its website. *Id.* Defendant's website does not direct electronic activity into Virginia with the manifest intent of engaging in business or other interactions with Virginia in particular. *See id.* (citing *ESAB Group*, 126 F.3d at 625–26 (holding that a company's sales activities "focusing generally on customers located through the United States and Canada without focusing on and targeting" [the] forum state do not yield personal jurisdiction)).

[Plaintiffs'] prospective clients." (Maida Decl. ¶ 6.) Unfortunately, Maida gives no explanation or example in support of this conclusory observation. Plaintiff alleges it made plans "in reliance on the lack of any other user of" the name Fostermade or Foster Made. (Compl. ¶ 5.) But they at least knew a different entity already owned the internet domain name fostermade.com. Even viewing these alleged injuries most favorably to Plaintiff, they must be accompanied by Defendant's sufficient minimum contacts with Virginia in order for jurisdiction to be upheld, and the Court concludes that Defendant lacks the necessary contacts in this case. *See ALS Scan*, 293 F.3d at 714.

In sum, nothing in the record indicates Defendant acted "with the manifested intent of engaging in business or other interactions within" Virginia. *ALS Scan*, 293 F.3d at 714. In the context of this cause of action based entirely on Internet activity, Plaintiff fails to establish a prima facie case for specific personal jurisdiction over Defendant. This means that, were the Court to require Defendant to defend his interests in Virginia, the requirement would "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. The Court will grant Defendant's Motion to Dismiss.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss. The Court will dismiss Plaintiff's Complaint without prejudice.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: 9/28/18
Richmond, Virginia